UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA            :        04 Cr. 409 (LMM)

            - v -                   :        MEMORANDUM AND ORDER

STEVEN A. KIRINCIC,                 :

                Defendant.          :

------------------------------------x

McKENNA, D.J.,

**1.**

        The above defendant pleaded guilty on February 28, 2005,
without a plea agreement, to Count One of a two-count indictment.
That count charged him with conspiring, in violation of 18 U.S.C.
§ 371, to "embezzle, abstract, purloin, and misappropriate moneys,
funds, premiums, credits, and other such property of a person
[Mutual of America Insurance Company ("MoA")] engaged in the
business of insurance affecting interstate commerce in violation of
Title 18, United States Code, Section 1033(b)(1)." (Indict. ¶ 2.)
The offense conduct is described as follows in paragraph 3 of the
indictment:[1]

                a.   In or about March 2000, KIRINCIC and
        MEYER formed a partnership called Stesco to manage
        and invest client money through investment products
        offered by Mutual of America Insurance Company
        ("Mutual of America").

                b.   On numerous occasions from in or about
        February 2000 through February 2002, in Manhattan,

------------------------------------------------------------

        [1] Scott Meyer was indicted with the above defendant.

New York, KIRINCIC, then a Vice President of Billing Services for Mutual of America, used his access to Mutual of America's computer systems to alter the company's records to fraudulently record deposits into Mutual of America investment products for Stesco clients.

c. During the course of the conspiracy, MEYER received cash from a Stesco client for deposit into that client's Mutual of America account, and instead of depositing that cash, MEYER split the money with KIRINCIC, and KIRINCIC used his position at Mutual of America to make it appear that a contribution had been made, when in fact it had not.

(Indict. ¶ 3.)

The Presentence Investigation Report[2] as revised on October 7, 2005 ("PSR") calculated a Guidelines offense level of 19 (composed of 6 levels as the base offense level pursuant to U.S.S.G. § 2B1.1(a)(2), plus 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H), on the basis that the relevant loss exceeded $400,000 but not $1,000,000, plus 2 levels pursuant to U.S.S.G. § 3B1.3, on the basis that defendant abused a position of trust, less 3 levels pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility).  (PSR ¶¶ 38-48.)  Since defendant's criminal history category is I, the resulting Guidelines sentence range is 30-37 months.  The loss figure -- "an amount between $400,000 and $1,000,0000" (PSR ¶ 31) -- used in the Guidelines calculation

---

[2] Probation used the November 1, 2004 U.S.S.G. Manual.  (PSR ¶ 37.) Neither party has disputed the choice of the 2004 Manual, and references throughout, except as otherwise noted, are to the 2004 Manual.

represented "intended loss"; the actual loss to MoA was $41,173.76. (PSR ¶¶ 34 & 40.)[3]

A Fatico hearing as to the loss amount was held on August 18 and November 2, 2006, at which George Medlin, an MoA executive vice president responsible for MoA's internal audit division, testified.

As described in the PSR and summarized by the government, the scheme worked as follows[4]:

Stesco earned fees by charging its clients a sliding scale advisory fee ranging from 15% to 5% of quarterly earnings, depending on the client's total account balance. (Gov't Letter Mem., Jan. 13, 2006, at 1.) "To increase the amount of money [defendant and Meyer] could make from their investment advisory business, Kirincic and Meyer conspired to create false earnings in the [MoA] accounts of Stesco clients, as well as in their own accounts and the accounts of family members." (Id.) False earnings entries in MoA accounts were created by defendant, who had access to the accounts, in three ways: "(1) fictitious contributions; (2) backdating; and (3) unit debit remainders." (Id. at 2.)

---

[3] This actual loss does not include $74,084.30, which represents legal fees incurred by MoA in connection with this matter. (PSR ¶ 34.) Probation has not included this legal fee amount in the restitution it recommends. (Id. at 20.)

[4] The scheme was described as operating in substantially the same manner at the Fatico hearing.

Fictitious contributions were entered into MoA's computer system either by changing a figure, as by changing a $25 remittance to a $3025 remittance (see PSR ¶ 21), or by misapplying customer contributions, as by depositing a $20,000 check received from a customer in Meyer's account and then arranging a $20,000 credit to the customer's account without Meyer losing the $20,000 credit. (See id. ¶ 23.)

Backdating involved crediting a Stesco client deposit to the client's MoA account as of a date earlier than the date as of which it should have been credited. Since MoA customers' deposits are converted into units of MoA investment products, backdating a deposit to a date on which the unit value of an investment product was lower would result in the Stesco client holding more units than would have been the case absent backdating, as when a $500 deposit that should have been credited on May 14, 2001, when the relevant unit value was $39.16, was credited as of April 3, 2001, when the unit value was $33.37, so that the Stesco client got 2.21 extra units. (See id. ¶ 25.)

The unit remainder manipulation worked as follows:

On certain occasions, after a contribution was processed, Mutual of America records show that the contribution would be reversed out, but using a different VTD [i.e., valid transaction date] than that used for the deposit. Because a different VTD date was used, the unit value was different, and the same dollar value corresponded to a different number of units. The proper dollar value would be reversed out, but the incorrect number of units would be removed, leaving remainder units in the

4

account.  These  remainder  units  would  then  be
transferred to another fund.

(PSR ¶ 27.)  As a result of this type of manipulation, as an
example, a credit of $4,483.13 was created to a Stesco client's
account.  (See id. ¶ 28.)

The result of the described manipulations was that a
number of Stesco clients were credited on the records of MoA with
amounts -- whether calculated in cash or in units of MoA investment
products -- greater than they were entitled to have credited to
them.  MoA attributes $265,525 of these overcredits to fictitious
contributions, $128,049.45 to unit debits, and $200,311.66 to
backdating, for a total of $593,886.11.  (See Gov't Ex.8 at 1.)

Defendant has challenged some of such calculations, but
has not shown that the total should be reduced to $400,000 or less,
as would be necessary to reduce the Guidelines range based on the
calculations for which the government argues.

**2.**

The government contends that the Guidelines loss
calculation should be based on "intended" loss.  (Gov't Letter
Mem., Jan. 18, 2007, at 3-5.)

The relevant 2004 Guideline provides (subject to an
exception not relevant here) that "loss is the greater of actual
loss or intended loss."  U.S.S.G. § 2B1.1 app. note 3(A).  "Actual
loss" is defined as "the reasonably forseeable pecuniary harm that
resulted from the offense," id. 3(A)(i), and "reasonably forseeable

5

pecuniary harm" is defined (for purposes of this guideline) as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. 3(A)(iii). "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense," including "intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." Id. 3(A)(ii).

Defendant contends that "the Government failed to carry its burden to prove that the intended loss was any greater than the actual loss." (Def. Letter Mem., Dec. 26, 2006, at 1.) According to defendant, he and Meyer "did not intend to profit directly by whatever manipulations were occurring at [MoA]. Their profit was intended to be derivative. They received a small percentage of the growth -- whether it was legitimate or illegitimate -- of their client's funds." (Id. at 2.) Thus, while there was a potential that MoA could lose the amount of overcredits caused by defendant, that possibility did not occur (except to the extent that Meyer did withdraw funds improperly credited to himself or his family). (Id. at 3-4 (citing Medlin testimony).) The potentiality of loss to MoA flowed from the right of the Stesco clients to withdraw their funds, but such withdrawal would, in turn, reduce the profits of defendant and Meyer, which were based on a percentage of the

amounts credited to the clients. (Id. at 4.) Defendant argues that "[i]ntended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims." United States v. Yeaman, 194 F.3d 442, 460 (3d Cir. 1999) (citing United States v. Kopp, 951 F.2d 521, 529-31 (3d Cir. 1991)).

      The government responds that:

> "[I]ntended loss seems presumptively to refer to losses that might naturally and probably flow from the fraud." "[T]he concept underlying the distinction between actual and intended loss is that the defendant may have the goal of depriving the victim or victims of more than the constraints of the situation 'actually' permit. The significance is that the defendant's acts should be measured by intentions." "Intended loss is tantamount to the probable loss from a particular misstatement because one is presumed to intend the natural and 'probable' consequences of one's acts." "Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose."

(Gov't Letter Mem., Jan. 18, 2007, at 3-4 (quoting United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997), and United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000).)

**3.**

      It is necessary first to consider the 2004 Guidelines applicable in the present case, because a 1991 amendment of U.S.S.G. § 2B1.1 (Amendment 617, effective November 1, 2001) makes significant relevant changes in relation to the determination of loss, specifically, as relevant here, reflected in U.S.S.G. § 2B1.1

7

app. Note 3(A)(i)-(iv), which appears in the 2004 Guidelines in the same language as introduced by Amendment 617.

The 1987 Guideline used in <u>Jacobs</u> (<u>see</u> 117 F.3d at 94 n.9), U.S.S.G. § 2F1.1 (1987),[5] provided that "[i]f the estimated, probable or intended loss exceeded $2,000, increase the offense level as follows," there following a list of loss ranges in dollars with attached number levels to be added to the base offense level. U.S.S.G. § 2F1.1(b)(1) (1987). An application note stated that: "In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the 'loss' would be treated as $40,000 for purposes of this guideline." U.S.S.G. § 2F1.1 app. note 7 (1987).

The quoted application note was amended in 1991, U.S.S.G. App. C, Amendment 393, effective November 1, 1991, to delete the reference to "probable loss." <u>See</u> <u>United States v. Wimbish</u>, 980 F.2d 312, 314 (5th Cir. 1992). In <u>Jacobs</u>, the Second Circuit, citing <u>Wimbish</u>, 980 F.2d at 314-15, said that "the dropping of

_____

[5] "Effective November 1, 2001, [U.S.S.G.] § 2F.1 was deleted by consolidation with § 2B1.1," <u>United States v. Cassova</u>, 412 F.3d 331, 342 n.10 (2d Cir. 2005) (citations omitted), "the substance of many of [§ 2F1.1's] provisions being moved to [§ 2B]." <u>United States v. Reifler</u>, 446 F.3d 65, 107 (2d Cir. 2006) (citation omitted).

'probable' from the formula is probably not significant," adding that "'[p]robable' seems still to be an appropriate standard because one is presumed to intend the natural and probable consequences of one's acts." 117 F.3d at 95 (other citation omitted). The Court of Appeals in <u>Jacobs</u> also pointed out that "the concept underlying the distinction between actual and intended loss is that a defendant may have the goal of depriving the victim or victims of more than the constraints of the situation 'actually' permit. The significance of the defendant's acts should be measured by his intentions." <u>Id.</u> (citation omitted).

In 2001, the relevant Guideline was further amended. U.S.S.G. App. C, Amendment 617, effective November 1, 2001.[6] This Amendment "provides a new definition of loss applicable to offenses previously sentenced under [U.S.S.G. § 2B1.1]. The revised definition makes clarifying and substantive revisions to the definitions of loss previously in the commentary to [§ 2B1.1] . . . resolves a number of circuit conflicts, addresses a variety of application issues and promotes consistency in application." U.S.S.G. App. C. Vol. II, at 180. The Commission retained "the

---

[6] The cases other than <u>United States v. Jacobs</u> that the government cites to support its position (<u>see</u> Gov't Letter Mem., Jan. 18, 2007, at 4) all predate Guidelines Amendment 617, effective November 1, 2001. In a relatively recent case, <u>United States v. Ravelo</u>, 370 F.3d 266 (2d Cir. 2004), in which a Guidelines Manual reflecting Amendment 617 was used, it is clear that both the opinion for the court and Judge Raggi's concurrence, whatever their differences, are entirely focused on the defendant's intention in the determination of loss to be attributed to the defendant's use of fraudulent credit cards.

core rule that loss is the greater of actual and intended loss," provided a "definition . . . for intended loss that is consistent with the rule regarding the interaction of actual and intended loss," and resolved a circuit conflict "to provide that intended loss includes unlikely or impossible losses that are intended." Id. at 180-81. It also pointed out that "concepts such as 'economic reality' or 'amounts put at risk' will no longer be considerations in the determination of intended loss." Id. at 181 (citing United States v. Bonanno, 146 F.3d 502 (7th Cir. 1998) and United States v. Wells, 127 F.3d 739 (8th Cir. 1997))[7].

U.S.S.G. § 2B1.1 (2004), reflecting Amendment 617, clearly does not include in intended loss -- defined as "the pecuniary harm that was intended to result from the offense," even if "impossible or unlikely to occur," id. App. Note 3(A)(ii) (emphasis added) -- cases of "reasonably forseeable pecuniary harm that resulted from the offense," id. app. Note 3(A)(i) -- the precise sort of harm that the government argues here should be

---

[7] Bonnano involved the issuance of worthless automobile insurance policies, those sold prior to the scheme being shut down by a state Department of Insurance obligating the purchasers to pay a total of $622,140 in premiums of which, at the time of the shutdown, $176,561.56 had been collected. 146 F.3d at 507. The defendants argued that loss should be determined as the amount collected, but the district court found "the loss they intended to inflict amounted to $622,140." Id. at 509 (footnote omitted). The district court was affirmed in this respect. Id. at 510. The court of appeals opinion stated: "When the guidelines speak of 'intended loss,' the relevant inquiry is not "How much would the defendants probably have gotten away with?,' but, rather, "How many dollars did the culprits' scheme put at risk?'" Id. at 509-10.

included in "intended" loss:  such forseeable harm, rather, is explicitly described as "actual loss."  Id.[8]

**4.**

Mr. Medlin testified as to how defendant's manipulation of MoA computerized accounts caused loss to MoA:  "When these transactions were processed and money was inappropriately placed in these accounts that inflated the actual balances, Mutual of America had no control over the funds in those accounts and the contract owners were free to withdraw that money at any time." (Transcript, Aug. 18, 2006, at 36.)[9]  The "loss" thus described is possible and can be described as money put at risk, but there is no evidence that defendant intended the Stesco customers to -- or, to use the language of Jacobs, that it was his "goal," 117 F.3d at 95, that they -- make withdrawals.  Rather -- since Stesco was deriving its income as a percentage of the inflated account values -- it was very much in defendant's interest that the customers withdraw nothing at all.  There is no evidence of any intention on his part that customers, or he himself, withdraw money, and it would be illogical to attribute a contrary intention to him.

_____

[8] The government suggests at one point that all of the loss it has established is "Actual or Intended Loss."  (Gov't Letter Mem., Jan. 18, 2007, at 3.)  But there is no provision in the Guidelines or case law that the Court has been made aware of that allows or suggests the conflation of actual and intended loss that this suggestion may imply.

[9] The only withdrawals to which Mr. Medlin testified were made by Meyer.  (Id.)

11

The government argues that "[e]ventually, whether it be tomorrow or many years down the road, the money would leave [MoA]." (Gov't Letter Mem., Jan. 18, 2007, at 4.) But that is simply speculation, and nothing in the Guidelines or the case law cited by the parties, or by the Court, suggests that such reasoning from supposed future events should be used in a Guidelines calculation.

Under U.S.S.G. § 2B1.1, since Amendment 617, intention governs. The government has not shown that defendant intended a loss greater than the actual loss of $41,173.76. Thus, U.S.S.G. § 2B1.1(b)(1) increases the base offense level by 6, not 14, levels, and the correct total offense level is 12, which, given defendant's criminal history category of I, results in a Guidelines sentence range of 10-16 months (Zone C).

**5.**

All other sentencing issues, whether as to departures from the Guidelines or as to whether or not to impose a non-Guidelines sentence, will be considered at sentencing, which is scheduled for December 10, 2007, at 4:15 P.M.

SO ORDERED.

Dated:  October 29, 2007

Lawrence M. McKenna
U.S.D.J.